Fred G. Moritt, J.
The facts are virtually not in dispute. The court uses the words “ virtually not in dispute ” advisedly.
The trial of this landlord and tenant nonpayment of rent case commenced on Friday afternoon, January 10, 1964, about 3 o’clock and took up almost all of the afternoons of the said Friday and Monday, and concluded late Tuesday afternoon.
After the trial had practically closed (as hereinafter will be indicated), the attorney representing the Corporation Counsel in this case, announced that he had a statement to make, whereupon counsel for the landlord also asked for the right to make a statement. The statement that each wished to make and which they did make was that as late as ‘ ‘ last night (meaning Monday night and early Tuesday morning), none of the tenants was receiving any heat.” Together with this embarrassing admission, counsel for the landlord decided to concede that all the testimony of the four tenants and also the Building Department and Health Department Inspectors was true, and he threw his client on the “mercy of the Court.” Of course, this latter remark was absurd because matters in the Civil Court involve the pocketbooks of landlords and tenants and is not a criminal court which has jurisdiction over crimes, prisons and fines.
The landlord’s previous testimony was evasive, shifty and wholly unworthy of belief before the concessions. The testimony of the said Building Department and Health Department Inspectors and all of the tenants was, in substance, that the premises and the homes of the tenants were not fit for human beings to live in; that they had not received heat in October, November and December; that they had received no hot water during these months; that as a result of the lack of heat, the wife of one of the tenants caught a cold which developed into pneumonia ; that she was suffering from an asthmatic condition and because of the extreme cold in this zero weather she has an atomizer always at hand because of the effect that the cold has upon her condition; that all the apartments were swarming with roaches, and the Health Department described the roaches as Oriental ones and American ones, dead and alive, about an inch to an inch and a-half in size; that the apartments of the tenants were well kept and tidy; that there were holes in the floor which were a hazard to life and limb, especially for children; that the holes were so large that if a child fell through the hole, he would fall clear through to the cellar; that at one time when the Building Department Inspector came to inspect the premises he found that the water in the cellar was four to five inches high and he testified that he dared not even wade into it for fear of electric shock; that the ceilings and walls were falling apart and *477 were dangerous to life and limb; that the tenants for months had pleaded with the landlord to do something about these conditions and all that they received were promises and an unknown ‘ ‘ Puerto Rican, ’ ’ who was hired by the landlord to come around now and then as a handyman and then gave a second or two of spraying and disappeared.
The testimony also was undisputed that the thermostat which controlled the heat, which had originally been in the hallway where the tenants could get at it, had been changed, and that it had been moved and was under lock and key under the control only of the landlord. In addition to these conditions wherein men, women and children lived (the word “lived” is used advisedly), there were lighting fixtures which were broken, electrically dangerous, etc. and etc., ad infinitum, ad nauseam.
Time and time again the tenants pleaded with the landlord for succour. Most of the time he gave them excuses and in return received their money for “ rent.” In desperation, the tenants when sued for nonpayment herein, finally decided to defend, with the aid of the Corporation Counsel.
Twenty-nine violations had been placed upon the property. It was candidly conceded by the Building Department Inspector that some of the violations were not hazardous or dangerous to life, limb or health, but that a majority of them were. This court did not (and does not) consider violations which were not a hazard to life and limb as a defense by the tenants for an abatement of rent.
It was also conceded by the Building Department Inspector that some minor repairs were made and some minor violations not involving health, etc., removed, and there is no question of fact that violations still remained as aforesaid, viz.: a menace to life, limb and health.
The City of New York is not a party in these summary proceedings. The tenants appeared either in person or via their wives.
When the trial opened, the Corporation Counsel of the City of New York, the Hon. Leo Larkin, by one of his law assistants, Mr. Emanuel Penstein, asked permission of the court to appear amicus curias for three of the tenants whose names are Martise, Walston and Traham, whom he characterized as “ relief clients.” Valsechi is not a relief client, but, in fact, a taxpayer gainfully employed.
The court might add parenthetically that the law is the same for taxpayers and relief clients. No authorities need be quoted.
The position of the Corporation Counsel of the City of New York, appearing amicus curiae for the Welfare Department of *478 the city, was that his three “ relief clients,” Martise, Walston and Traham, were entitled to a dismissal of the petition on the merits, which, to put in simple English, meant that the position of the Welfare Department was that if the court, as trier of the facts, believed the proof offered by the tenants, that no rental moneys were due to the landlord in any shape, manner or form. Upon questioning by his adversary, the Corporation Counsel also made it clear that his position was that if the repairs were made after the commencement of this proceeding, that the City of New York still insisted upon a dismissal of the petition on the merits, as aforesaid, and upon further inquiry by the landlord’s attorney in a hypothetical case posed by landlord’s attorney in homely fashion, “ Supposing the landlord were to make the repairs between the time of the starting of the trial, viz.: on Friday until the end of the trial, viz.: on Tuesday, if the landlord were to make the necessary repairs, would the landlord then be entitled to rent moneys 1 ” And the Corporation Counsel’s position was a simple, “No.”
Prior to the commencement of trial, the tenants had been ordered to deposit their rental moneys in court by a previous Judge, pursuant to section 755 of the Beal Property Actions and Proceedings Law. The tenants duly obeyed the order and have on deposit in this court the sum of about $838. The Corporation Counsel also called to the court’s attention section 143-b of the Social Welfare Law and sections 56A45.0 and 564-16.0 of the Administrative Code of the City of New York.
And so, the simple issue before this court was as follows: Either the landlord was entitled to his rents, which had been deposited with the Clerk of this court as aforesaid, or the tenants were entitled to the return of their “ rent ” money which they had deposited in court, by reason of the proof that they offered.
By the virtual concession of landlord’s counsel and the proof adduced, what was described as “homes ” were in effect “ pigsties,” and not only unfit for human habitation but dangerous to their lives, safety and health. Life in these premises is one of grinding poverty.
Since there are no issues of fact, the question is whether in law this court has the power to give the tenants relief. This court is not unmindful of the Canons of Judicial Ethics of the American Bar Association, especially Judicial Canons 19, 20 and 23. Quoting from the pertinent parts of said Judicial Canon 19: “ In disposing of controverted cases a judge should indicate the reasons for his action in an opinion showing that he has not disregarded or overlooked serious arguments of counsel. He thus shows his full understanding of the case, avoids the sus *479 picion of arbitrary conclusion, promotes confidence in his intellectual integrity and may contribute useful precedent to the growth of the law.”
The court is not unmindful of the other part of the section: “ But the volume of reported decisions is such and is so rapidly increasing that in writing opinions which are to be published judges may well take this fact into consideration, and curtail them accordingly, without substantially departing from the principles stated above,”
The court wishes to quote in detail Judicial Canon 20: “A judge should be mindful that his duty is the application of general law to particular instances, that ours is a government of law and not of men, and that he violates his duty as a minister of justice under such a system if he seeks to do what he may personally consider substantial justice in a particular case and disregards the general law as he knows it to be binding on him. Such action may become a precedent unsettling accepted principles and may have detrimental consequences beyond the immediate controversy. He should administer his office with a due regard to the integrity of the system of the law itself, remembering that he is not a depository of arbitrary power, but a judge under the sanction of law.”
And Judicial Canon 23:£ ‘ A judge has exceptional opportunity to observe the operation of statutes, especially those relating to practice, and to ascertain whether they tend to impede the just disposition of controversies; and he may well contribute to the public interest by advising those having authority to remedy defects of procedure, of the result of his observation and experience.”
Judges are not required to live in ivory towers. It is reasonable to assume that they have gone through the gamut of blood, sweat and tears and- the joys of living, and this court is not unmindful of the publicity given to the decisions of this court since it has been sitting in Landlord and Tenant Part 2.
What prompted the above was a front-page article in one of our major newspapers which quoted a decision of this court as being “unprecedented,” As a result, other newspapers from Washington, Albany and the Metropolitan area have been calling this court for a “ clarification.” To put it simply, these great newspapers need no “ clarification ” as to this court’s decision inasmuch as their flat statements that this court’s decision was ‘ ‘ unprecedented ’ ’ was, alas, erroneous.
This court’s decision was not “unprecedented.” The fact that newspapers published it for the first time does not make a precedent “ unprecedented.” This court simply relied upon the *480 decision of our court of last resort, the Court of Appeals in a unanimous decision written by Judge Cardozo, one of our Nation’s greats, a former Chief Judge of the Court of Appeals and Justice of the United States Supreme Court, in the case of Fifth Ave. Bldg. Co. v. Kernochan (221 N. Y. 370, 373) in which Judge Cardozo said, among other things: “ If such an eviction, though partial only, is the act of the landlord, it suspends the entire rent because the landlord is not permitted to apportion his own wrong.” (For other authorities to this elementary proposition of law see Walsh, Beal Property [2nd ed.]; Carmody, Summary Proceedings; Tiffany, Beal Property, and cases cited in said texts.)
At the conclusion of the trial, the Corporation Counsel asked for (1) a dismissal of the petition on the merits; and (2) he also moved to dismiss the petition on the novel and far-reaching ground that the petition was jurisdictionally defective in that the landlord’s failure to allege “ that there are no violations on the property” was a jurisdictional defect and that as a matter of law no landlord can come into' court without such allegation.
This court may sympathize with the Corporation Counsel’s motion but this court cannot allow its heart to rule but must follow rule, law and legal precedent. His motion is more properly addressed to the Legislature of the State of New York or to the Judicial Conference or the appropriate Appellate Division for rule-making, and it is not for this court to make new law. To grant the Corporation Counsel’s motion would in effect be creating a new jurisdictional requirement which is not now in the law, thus nullifying all landlords’ petitions. The motion is, of course, denied. However, this court wishes to point out in “ clarification ” that by coincidence this trial concluded on the day that a member of the Assembly introduced a bill in Albany taking “ a position similar to that taken last Wednesday by a Civil Court Judge in Brooklyn, which ruled that tenants could live rent free as long as landlords failed to correct housing violations that menaced health or safety. He interpreted the landlord’s failure to provide required services as an action that terminated the requirement of rent.”
This court takes no position on this legislation except to point out that the proposed bill would be merely a repetition of existing law as stated by Judge Cardozo. “ The ancient landmarks have keen preserved.” (Fifth Ave. Bldg. Co. v. Kernochan, supra, p. 376.)
In the same newspaper, it was stated that “ Mayor Wagner has proposed a different approach to the problem. In legislation *481 that he will offer in the next two weeks, rents would be paid into a special fund to be used for repairs when the Commissioner of Health certified that the housing conditions constituted a major threat to public health.”
This court has a high personal regard for Mayor Wagner, his former colleague in the Assembly, but in accordance with ancient tradition (Judicial Canon 23), this court feels compelled to state that it believes that this proposed legislation, if ever offered to the Legislature, would be unworthy, unconscionable and unconstitutional. With reference to taxpayers such as the tenant Yalsechi in the case at bar, it would be confiscatory. It is unjust to have a taxpayer who has not received services to be required to deposit to any fund, whether in court or to a subdivision of government, for services the taxpayer did not get, to subsidize or to contribute to a defaulting landlord. Its absurdity appears on the face.
With reference to “ relief clients,” as the terminology is used by the Department of Welfare, the City of New York has sufficient power now, under section 143-b of the Social Welfare Law, viz.:
“ Avoidance of abuses in connection with rent checks 1. Whenever a recipient of public assistance and care is eligible for or entitled to receive aid or assistance in the form of a payment for or toward the rental of any housing accommodations occupied by such recipient or his family, such payment may be made directly by the public welfare department to the landlord.
‘ ‘ 2. Every public welfare official shall have power to and may withhold the payment of any such rent in any case where he has knowledge that there exists or there is outstanding any violation of law in respect to the building containing the housing accommodations occupied by the person entitled to such assistance which is dangerous, hazardous or detrimental to life or health. A report of each such violation shall be made to the appropriate public welfare department by the appropriate department or agency having jurisdiction over violations.
“ 3. Every public welfare official shall have the power to initiate or to request the recipient to initiate before the appropriate housing rent commission any proper proceeding for the reduction of maximum rents applicable to any housing accommodation occupied by a person entitled to assistance in the form of a rent payment whenever such official has knowledge that essential services which such person is entitled to receive are not being maintained by the landlord or have been substantially reduced by the landlord.
*482 “ 4. The public welfare department may obtain and maintain current records of violations in buildings where welfare recipients reside which relate to conditions which are dangerous, hazardous or detrimental to life or health.
‘£ 5. It shall be a valid defense in any action or summary proceeding against a welfare recipient for non-payment of rent to show existing violations in the building wherein such welfare recipient resides which relate to conditions which are dangerous, hazardous or detrimental to life or health as the basis for non-payment.
“ 6. Nothing in this section shall prevent the public welfare department from making provision for payment of the rent which was withheld pursuant to this section upon proof satisfactory to it that the foregoing violations were cleared. Where rents were reduced by order of the appropriate rent commission, the public welfare department may make provision for payment of the reduced rent in conformity with such order.”
In the case at bar, the tenants Martise, Walston and Traham, received the relief money from the City of New York directly. The relief tenants then deposited the moneys they had gotten from the City of New York with the Clerk of this court. The money therefore belongs to the relief tenants. This court suggests that instead of giving the money to relief tenants in cases involving the terrible conditions as they exist in the case at bar, that the Department of Welfare merely withhold its money if necessary from “ slumlords,” under section 143-b of the Social Welfare Law until such time as a court of competent jurisdiction has spoken, relying upon the authority and language of Judge Cardozo in Fifth Ave. Bldg. Co. v. Kernochan (supra). These moneys placed by the tenants with the Clerk of the court jyy order of a previous Judge, are escrow moneys, trust fund moneys, belonging only to the tenants, and are to be returned to the tenants, as aforesaid.
If the Department of Welfare wishes to avoid this situation which they created, let them take advantage of old law previously enacted by the Legislature, viz.: the said section 143-b of the Social Welfare Law, or where in other appropriate cases, the court directs the deposit of the moneys of “ Welfare clients,” that the Department of Welfare deposit it directly with the court and not via relief checks directly with the “ relief tenants.”
In conclusion, counsel for the landlord is entitled to a ruling on a suggestion that he made that sections 143-b and 755 of the Real Property Actions and Proceedings Law were in derogation of the common law and that the opinion of Judge Cardozo in Fifth Ave. Bldg. Co. v. Kernochan (supra) is not the law. *483 The court rejects such suggestion and merely repeats that the new statutes enacted were not in derogation of the common law, but in addition thereto, again relying upon the language of Judge Caedozo with reference to statutory construction. ‘ ‘ If the purpose had been [otherwise], it would have been very easy to say so in terms too clear for misconstruction. The re-enactment of the [new] section was an adoption of the meaning which it had acquired by judicial construction for more than a half a century. * * * Changes in the arrangement or in the division of sections will not work a change of meaning unless the intent to change is manifest. * * * We cannot believe that the legislature would have overthrown such a rule without clearer token of its purpose. It would not have retained the old phrases, and left the change of meaning to be gathered by doubtful inference from the order of the sections. More significant than anything which it did change are the things which it omitted to change. The ancient landmarks have been preserved.” (Fifth Ave. Bldg. Co. v. Kernochan, supra, pp. 375-376.)
For the reasons hereinabove stated, and upon the facts in the record, and upon the law, the petitions are dismissed on the merits and the Clerk of this court is directed to return the moneys heretofore placed on deposit by the tenants, to the tenants.